J-S41017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ADAM LEYTRICK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| STEPHANIE LEYTRICK | : | |
| | : | |
| Appellant | : | No. 815 WDA 2023 |

Appeal from the Order Entered June 14, 2023
In the Court of Common Pleas of Mercer County Civil Division at No(s):
No. 2022-02278

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                **FILED:  December 21, 2023**

Appellant, Stephanie Leytrick ("Mother"), appeals from the order entered on June 14, 2023, which denied Mother's petition to relocate and modified an existing child custody order.  We affirm.

The trial court thoroughly summarized the underlying facts of this case:

Mother [currently resides in Grove City, Pennsylvania] with the children C.L., 9 years old, and V.L., 7 years old.  [Adam Leytrick ("Father") is 44 years old] and also resides in Grove City, Pennsylvania.  Father resides alone, other than when the subject children are with him.

Father has lived in the Grove City area for approximately [14] years and the children have lived in the Grove City area their entire lives.  The parties were married April 24, 2010.  There is a dispute, and it is unclear, when the parties separated.  Mother alleged both March 2022 as well as September 2022 while [Father] alleged January 2022.  All parties agreed since separation the children have resided primarily with [Mother].

---

[*] Former Justice specially assigned to the Superior Court.

Father was previously employed as a meat cutter at Giant Eagle in New Castle, Pennsylvania. He is currently unemployed but the issue is being grieved through the union process. Mother works for an agency known as "clipboard" and is [a registered nurse ("RN")]. She works primarily in long term care facilities in Beaver and Clarion Counties. Mother currently makes $48.00/hour. Mother works approximately [20] hours per week.

Mother's parents live approximately [45] minutes from her current location as does her brother. She also has four [] nieces and nephews, ranging in age from [four] to [11].

Father's family is comprised of [61] people from the generation of his parents, himself, and his children. The court notes the subject children are close with their paternal cousins. Mother admitted the children have a good relationship with their maternal grandparents as well as with paternal grandmother.

All witnesses agreed the children are well-behaved, do well in school, and are active. When with [Father], the children play with other kids in his neighborhood, C.L. plays garage hockey with [Father], they go on walks, or hunting, [Father] plants flowers, watches movies and cooks with V.L. and they all go swimming in the pool. V.L. likes to sing and dance. When the children are with [Mother] they go bowling, to the park, play school, play frisbee, play ball, or go to the Olympic Fun Center, a roller skating facility. Discipline in [Father's] house is time out or a smack on the butt and [Mother] testified to relying on timeouts. No evidence was presented as to any physical abuse of the children by any party.

Other than one PFA to be discussed hereinbelow, no evidence was presented as to any physical abuse between the parties and in fact, [Mother] specifically stated [Father] was not physically abusive. Mother admitted [Father] loves the children.

Father testified [Mother] is a great mother and has always had the best interest of the children at heart until her recent decision to relocate to [Lee's Summit, Missouri]. At the time of the children's birth, [Father] worked full-time and [Mother]

worked part-time. Therefore, [Mother] undertook most of the duties with the children although [Father] cooked and helped with diapers.

Father did know the name of the children's dentist but incorrectly identified the children's pediatrician. When the parties were together [Mother] primarily took the children to the doctors and dentist and tended to them when they were ill. The children tend to come to [Mother] for emotional support. Father did not know the names of the teachers [and did not make any attempt to] call the school to find out. He indicated there was no need because the children do well in school. Father acknowledges there is probably an "app" that would allow him to have information regarding the children's extracurricular school activities but he had not investigated same.

Father indicated he did not attend children's events because he did not have notice or had to work. The court notes [Father] did not utilize the ability for a school "app" to educate himself. Father admits he has not gone to many of the children's medical appointments. Mother has on at least one occasion sent [Father] a video of the child's extracurricular school activity.

C.L. played baseball for two (2) years. Father coached the first year and attended all practices and games the second year. The child did not play a third year because [Mother] would not commit to make sure the child was there and is not playing this year because [Mother] will not commit as a result of her desire to move to [Lee's Summit, Missouri] with the children.

The controlling custody order is of November 10, 2022. The order provides the parties share joint legal custody with [Mother] exercising primary physical custody. Father's partial custody is on a "week one" and "week two" basis. Week one [Father] has the children from Sunday at 3:00 p.m. until Tuesday morning until they are put on the school bus or returned to [Mother] at 9:00 a.m. Week two [Father] has the children from Saturday at 9:00 a.m. until the children are placed on the bus or return to mother at 9:00 a.m. on Monday morning.

During Week two [Father] also exercises custody from Thursday after school until Friday morning when the children are placed on the school bus or return to [Mother] at 9:00 a.m. This order provides Thanksgiving visitation with [Mother] from 9:00 a.m. to 4:00 p.m. and [Father] from 4:00 p.m.

In support of [Father's] case, in addition to his testimony, he presented the testimony of his mother, Marsha Leytrick, his [sister-in-law], Susan Leytrick and his aunt, Susan Dellapiazza. Mother presented the testimony of herself, as well as her fiancé, Jason Atkinson, and her father, Paul Sereda. All witnesses which addressed [Father's] drinking agreed [Father] had a moderate to severe drinking problem prior to March 2022. Father likewise agreed. Father drank approximately [eight to 12] cans [of] beer on a daily basis. All evidence indicated [Father's] drinking occurred after work, and while at the home. Father voluntarily went to rehab because [Mother] threatened she would move away and he would never see the children again. Father successfully completed a [14] day rehab at Banyon Treatment Facility in March 2022. Father's "sober date" is March 21, 2022. Father stated he has an occasional urge to drink, but not very often. When he does, he makes a phone call or attends a meeting.

All of [Father's] witnesses testified since rehab [Father] has not consumed any alcohol in any manner. To maintain his sobriety [Father] reads "the big book," attends meetings, attends speaker meetings, and talks with a woman that has over a decade of sobriety.

Paternal grandmother testified since [Father's] rehab there has been a 100% change, he is 100% active in the children's lives, spends time with the children playing garage hockey, swimming, and other activities. Paternal grandmother indicated no concern for the children's safety in [Father's] custody, no evidence of a relapse, and they talk daily. Paternal grandmother indicated when [Father] was drinking you could tell by his eyes, his more "mellow" attitude, but she did not notice a change in his speech.

Father's [sister-in-law], Susan Leytrick, indicated prior to rehab [Father's] drinking would render him lethargic, slurred speech and his demeanor would be different and essentially

- 4 -

more isolated. She sees [Father] on an occasional basis. Since rehab there has been no evidence of drinking or alcohol issues.

Father's aunt, Susan Dellapiazza, indicated she was able to tell when [Father] had been drinking because of his red face, not eating, slurring speech, and isolating. She has seen no evidence since [Father's] rehab of drinking or any evidence of alcohol whatsoever. She has no safety concerns regarding the children being in [Father's] care and no doubt [Father] is no longer drinking.

Mother testified she believes [Father] continues to drink. However, the court does not find this testimony credible. Mother stated as a result of being together for [22] years she knows what [Father] sounds like when he is drunk and even in the last week, and multiple other times, she believes he has sounded drunk on phone calls with the children. However, when [Mother] requested the police to perform a welfare check as a result of her suspicions, the police took no action and did not remove the children from [Father's] care. Additionally, [Mother] testified the minor children told her [that Father "said that there was water in his beer can."] However, in addition to said testimony being hearsay, the children did not testify to same. Mother also alleged [Father] continues to drink based on a photograph, which was not admitted into evidence, allegedly containing a beer can within said photograph. Said evidence is insufficient to find [Father] continues to drink, or more importantly, any alcohol usage is a danger to the children.

Of concern to this court is [Father's] decision to unilaterally remove himself from depression/anxiety medications. It is this court's intent to order [Father] to schedule an evaluation, and to comply with any recommendations regarding treatment and medications. During [Father's] rehabilitation a physician ordered medication for depression and anxiety. This medication included one medicine to be taken one time daily, and a second medication to be taken [one to four] times a day, if needed. Father unilaterally removed himself from the medications in the last month or two without consulting, informing, or involving a physician.

In approximately September 2022 [Mother] requested a PFA order on behalf of herself and the children. Following a hearing on September 21, 2022 [the trial] court granted a [six] month PFA order with regard to [Mother] and denied the order with regard to the children.

Mother alleged in the [PFA] petition, in relevant part, through the course of an argument "[Father] flung the door open so forcefully, that the door knob hit [Mother] and knocked her down." Mother alleged this caused a bruise on her hip.

The petition also alleged the children are scared of [Father]. During the course of the instant proceedings [Mother] indicated regarding the PFA there was an argument, about custody of the children, and during the course of the argument [Father] pushed through an unlocked door and the door hit her in the hip. Mother alleged the door left a bruise "for weeks." Father testified he did not force the door open but rather placed his foot in the door to prevent [Mother] from closing it and he believed [Mother] fell into the door.

The court notes despite the allegations in the PFA petition the children were afraid of [Father], the children testified on September 21, 2022 in the course of the PFA hearing. At that time, V.L., was [six] years old, and indicated [Father] does "grab her by her hands or her arms and that it hurts" when she is not listening. Despite [Mother's] testimony she only uses time out, V.L. through the course of the PFA hearing testified [Mother] smacks her on the butt "sometimes" and that [Father] "does it all the time." When this court asked whether [Father] ever says anything that makes V.L. afraid of him, she limited her response to an incident in which she believed [Father] forced her to "eat a pill." When the [trial court] followed up asking if [Father] had ever done or said anything that makes her afraid V.L. indicated no. V.L. specifically testified, "if [Father] didn't make me eat the pill I wouldn't be scared of him."

C.L. testified regarding the "pill" incident indicating [Father] attempted to have V.L. take an adult Advil as opposed to a small Advil. C.L. also testified sometimes [Father] says if the child calls [Mother] he would smack the child which "makes me feel a little bit scared." C.L. indicated [Father] has never actually smacked the child. C.L. indicated [Mother]

"sometimes she grabs my arm" when he is not listening essentially pinching his wrist. C.L. indicated [Father] was "way more scary because he screams really loud." Although child indicated [Father] makes "threats," child was unable to produce any examples. C.L. testified with regard to the "door" incident. The parents were arguing about [Father] taking children for custody time, [Mother] tried to shut the door and [Father] "like pushed it and then slammed it into my mom." Father believes his relationship with C.L. was awesome and they were both very active and like outside. Father's relationship with V.L. was very good and they plant flowers, cook and watch movies.

The [trial court] believes both parents have inappropriately talked with the children regarding the potential move to Lee's Summit[, Missouri]. The [trial court] finds [Mother] improperly influenced the children to desire to move to Lee's Summit. V.L. testified through the course of the instant proceedings the hearing was about moving to Kansas City and [Mother] told her that. V.L. testified they had been to Kansas City on [two] occasions. V.L. indicated the trip to Kansas City was like a vacation. V.L. testified she wanted to do gymnastics in Kansas City but did not know gymnastics were available in Mercer County. The child also stated she did not know what gymnastics were. Mother told V.L. there was gymnastics in Kansas City but did not tell her there was gymnastics in the area.

V.L. also wished to go to Kansas City because there is a roller coaster. When asked whether V.L. preferred to live in Grove City or Kansas City she indicated Kansas City. Her explanation was it was a bigger city. When the Court asked her to compare Kansas City to Pittsburgh, she indicated "Kansas City is way better" and it was because she was going to get new friends. When the [trial court] inquired as to whether V.L. would be okay staying in Grove City[, V.L. responded that] "it would have been okay, I mean no." When asked why the child twice simply stated she wanted to move to Kansas City, she indicated it is fun there. When V.L. was asked how often [Mother] talks to the child about Kansas City the child indicated "a little often." The child indicated if [Mother] was not able to go to Kansas City, [Mother] would be "really sad and she'll cry" and she will not be able to talk to her fiancé. V.L. also indicated [Mother], at least [three]

- 7 -

times, told her she would cry if she could not go to Kansas City. V.L. also indicated [Father] told her they are not moving.

C.L. indicated he was at the hearing because [Mother] wanted to move to Kansas City and he felt really good about it because he did not like going back and forth between his parent's houses and wanted to stay at [one] place. C.L. indicated he does not like his [Father's] house because he does not feel safe to go there but indicated [Father] has never hurt him, only hurts his feelings. C.L. indicated he would be okay only seeing his [Father] once or twice a year. When the Court inquired whether [Mother] told C.L. why she wants to move to Kansas City he indicated because she has a better job there, she met a really nice man there that helps her and it would be a better life for us. In fact, C.L. indicated [Mother] told him that the morning of the hearing.

C.L. also indicated [Mother] told him if the [court] does not approve the move to Kansas City "she would be really sad." C.L. alleges he hates going to [Father's house], gets nauseous at [Father's house], and sometimes cannot eat. When the court inquired as to why the child had earlier indicated he plays soccer, hockey and baseball at [Father's] house he said "to buy some time." When the court inquired whether [Mother] had even spoken to the child about how often he should see his [Father], the child indicated "maybe every [five] weeks." However, the child then denied the conversation. The court notes [Mother's] proposed visitation schedule is every [five] weeks. C.L. indicated Kansas City was preferable because [Mother] has a better job, there are "way better schools," "way better soccer and football leagues" and "way better friends and stuff." When the [court] inquired as to whether [Mother] told C.L. how she would feel if she could not move to Kansas City, he indicated she would cry "because she met a wonderful guy" and "he is the most amazing person." The move would allow "my mom can be happy every single day." He also indicated "my dad never treated my mom nice at all." The [court] notes some of the phrases used by C.L. do not seem the natural language of a [nine-year-old] child. Of note is [Mother] used the phrase that her fiancé was a "wonderful, caring man." The child also pointed out the [two] times they left Kansas City "my mom always cries because we have to leave."

- 8 -

The child indicated during the course of the instant proceedings on March 31, 2023 the incident with regard to the PFA "made me feel that I never want to see him again. I never want to care for him. He has hurt my mom so many times, her feelings. Sometimes when he hurts her feelings, he hurts mine." Interestingly, only a few weeks after the incident in September 2022 both children indicated they would have no problem going to [Father's] house again after a [two] week pause of visitation. C.L. indicated when he moves to Kansas City he will play pickleball but he does not play pickleball here because [Mother] told them they do not have it here. C.L. indicated his plan is to play sports in Kansas City but if he did not go to Kansas City he would probably not play sports here but he cannot answer why.

Father credibly testified he had great difficulty visiting the children prior to a court order or gaining any amount of time beyond the court order. Father credibly testified "it is always a struggle to get the kids" and when [Mother] works she takes the children to her parents rather than offering the time to [Father]. Father acknowledged in the last approximate month there have been [two] times [Mother] has agreed to extra time. One was the weekend of the hearing and the other was to allow [Father] to take C.L. hunting. Subsequent testimony established the hunting day was in exchange for [Father's] agreement to bring the children to a church event on Easter day. The children were at an Easter program at the maternal grandparent's church. Father agreed to bring the children for breakfast to the church and allow them to participate in the program, which occurred. Mother and her parents were in attendance. This credible testimony is contrary to [Mother's] testimony [Father] did not allow the children to see her at all this Easter.

Both parties threaten to, or actually, call the police on each other. Father wished [for] the children on Sunday at 9:00 a.m.[,] despite the fact the court order provided he did not receive custody until 3:00 p.m. on Sundays and he threatened to call the police. Mother called the police for a welfare check based on her alleged belief [Father] was under the influence and because [Father] was not allowing the children to talk to her "without supervision."

By agreement of the parties [the trial court] issued an order on December 22, 2022 providing the children to be with [Father] from December 22, 2022 after school, or 5:00 p.m., whichever is earlier, until 10:30 a.m. on Sunday. Mother then retained custody until January 2, 2023. Father did not appear at the scheduled exchange on Christmas Day at 10:30 a.m. requiring [Mother] to go to [Father's] home to retrieve the children. Father's explanations were inconsistent and lacked credibility. It was clear to the court [Father was] determined to simply disregard the court order.

Father's mother, Marsha Leytrick credibly testified she usually sees the subject children weekly, sometimes babysits the children and visits with the children at her home. She lives approximately an hour and half away from [Father's] residence[.] Her observation of the children and [Father's] interaction indicate "a lot of love" and she sees no signs of friction or fear. The witness testified, and it is clear to the [court], the parties do not get along well at all.

Father presented the testimony of his aunt, Susan Dellapiazza. The witness testified she is close with [Father], they see each other approximately twice a month, mostly at maternal grandmother's house in Bridgeville. The witness lives close to maternal grandmother. She believes [Father] is an outstanding and good father, he is very active, they fish, play garage hockey, cook and walk the dog. The witness described [Father] and children as close. The witness believed [Father] and children were a "very close unit."

Mother testified with regard to her desire to move to Lee's Summit, Missouri, a suburb of Kansas City. Although [Mother's] testimony couched the move for the benefit of the children, it is clear the sole basis for the move is her engagement to Jason Atkinson ("fiancé"). The relationship of [Mother] and fiancé began in March 2022 online and they first met in person in Missouri on March 24, 2022.

Initially the parties visited once a month and now visit every [two to three] weeks. On her first visit to Missouri she fell in love with the city. Mother testified the children did not meet fiancé until the end of 2022. This is contrary to testimony the children met the fiancé in August of 2022.

Mother made the decision at the end of 2022 or the beginning of 2023 to move to Lee's Summit. Lee's Summit is an approximate [12-hour] drive or [two-and-one-half] hour flight from the parties' current residences. The houses [Mother] proposes to rent in Lee's Summit are of a suburban nature with yards. The homes currently identified by [Mother] are approximately [one] block from fiancé, will be rented, and each has [four] bedrooms. It is [Mother's] plan to wed fiancé in October 2023, which she plans to do regardless of whether this court approves the relocation.

Upon the marriage it is [Mother's] belief her fiancé and his [four] children will move in to the home she is renting. [Mother] initially testified the children did not meet her fiancé until the end of 2022 although subsequent testimony established the first trip with the children to Kansas City was in August 2022 and that Christmas 2022 was the second trip. Mother indicated the [four] bedroom home can be rented for approximately $1,200.00 per month and her current rent for an apartment is $750.00 per month. Mother indicated if the court denies relocation she is unsure whether she will move to Kansas City but the marriage will still occur.

Mother testified in an incredible fashion she did not believe the move the Kansas City would affect the children's relationship with [Father] in any way because of technology. Mother did acknowledge [Father] would be unable to attend extracurricular or sporting activities, but alleged [Father] had never done so before. However, this court notes [Father] coached C.L. in baseball one year and in his second year attended all practices and games. When questioned whether [Mother's] proposed partial visitation with [Father] if the move is approved would affect her bond with children if the schedule was flipped, [Mother] was unsure.

Mother attempted to couch her desire to move to Kansas City with her fiancé as for the benefit of the children as it would show the children stability, emotional stability, and they would see a lifelong stable partnership between [Mother] and her fiancé. Mother testified she believes it important for the children to see her with a dependable and supportive partner. Mother believes it's very important for the children to see "love between a couple."

- 11 -

Mother testified education is very important and the kids are doing very well at Grove City. Mother further testified the school district in Kansas City is rated "A+" and that Grove City Schools are "B+". Mother was unable to provide any details other than an internet search to support the ratings. Mother acknowledged the class sizes appeared to be the same and there was no meaningful difference between the school districts. All parties agreed the children do well in school.

Mother currently makes $48.00/hour working for a company called "clipboard". She indicated this company is present in her proposed relocation and she would make $90.00/hour. Mother works *per diem* approximately [20] hours per week. Mother did not check whether there is higher pay available in any other cities other than Kansas City. Mother did not research any other school districts or schools in other cities, but rather chose the Lee's Summit Schools because that's where her fiancé's children attend.

Mother admitted she only researched the Lee's Summit School District after she decided to relocate. Mother is an RN. In Kansas City she should be able to obtain her BSN and work towards her goal of being a flight nurse at Ottawa University. Mother credibly testified this opportunity was not as easily available in her current location as the Ottawa program would be approximately [15] minutes from her home and any such programs in Pennsylvania would be at least [one] hour[] from her home.

Mother testified in Kansas City, her fiancé, and her fiancé's [two] sisters would be available for childcare. Mother also testified childcare would not be necessary as fiancé makes significantly more money and therefore, she could work less. Mother believed her RN license would easily transfer and her Pennsylvania license is sufficient to allow her to work in Missouri.

Mother asserted the childcare availability is particularly important with regard to the move as [Father] is not dependable and does not provide childcare and in fact at the last minute will cancel his commitments. The court notes the availability of maternal grandmother to babysit as well as daycares in the Grove City area. The court also notes the

children have a strong bond with the maternal grandmother and they see her every couple weekends.

Mother's fiancé is heavily involved in the church and they plan on having counseling for couples with blended families following the move. Mother proposes the court authorize the relocation to Kansas City area and grant her primary physical custody subject to [Father's] partial custody rights. Mother proposes [Father's] custody rights be comprised of [two] weeks in the beginning and end of summer as well as during the remainder of the year, [Mother] will return for a long weekend every [five] weeks. Mother also proposes a week of partial custody with [Father] at Easter and a week at Christmas time. Mother indicated she will pay all airfare for her and the children to return, she will then stay in the area visiting her family and friends, and then return with the children at the conclusion of each partial custody of [Father].

Mother presented the testimony of her fiancé, Jason Atkinson. The witness lives in Lee's Summit, Missouri with his [four] children, ages [14, 11, eight, and six]. He has never committed a crime, been subject of a restraining order, been a party to a Children & Youth Services investigation, nor is he subject to any physical disability or illness that prevents caring for children including mental illnesses or disabilities. [Fiancé] is Director of Business Development for a financial advisor and works 8:30 a.m. to 4:30 p.m., Monday through Friday.

[Fiancé] confirms the parties began talking on Twitter before visiting in person which they have done at least a dozen times. Mother and fiancé have visited both in Kansas City and in Pennsylvania and speak [two to three] hours a day, at least, on the phone. During the subject children's visit at Christmas 2022 they went to the park, played video games together, and played baseball. The parties also went to a golf driving range known as Top Golf, went to a nephew's wedding and "had a really fun time." [Fiancé] and C.L. played "a little bit" of pickleball in Kansas City. It is clear to the court fiancé has a very strong affection for both children.

[Fiancé] characterized the relationship between the children and [Mother] as very good. He indicated she is "the most fantastic mother I've ever met." [Fiancé] described the

neighborhood as houses of approximately 1,500 square feet, single family homes, and in the $200,000 range.

[Fiancé] is unable to relocate here due to the nature of his job especially in comparison to mother's ability to easily relocate as an RN. [Fiancé] added "obviously, I have [four] kids of my own, as well."

Mother also presented the testimony of her father, Paul Sereda. The witness lives in Greenville, Pennsylvania which is approximately [35] minutes from the [parties'] current location.

The witness owns a tavern. He sees the subject children usually a couple times a week and at least, every other weekend. They go to the park which is right next door to his residence, play ball, ride on the side by side, or go through the woods, go to fairs, horseback riding, and around farms. He also teaches C.L. about gun safety. Since the parties' separation witness has not observed [Father] around the children. Witness sees the children a lot more in the summer. Witness has taught V.L. how to play guitar and maternal grandmother has taught the children some piano.

Both the maternal grandparents spend a lot of time with the children and have a very close bond. Witness described [Mother's] relationship with the children as very caring and "a mother bear" and believe she is a wonderful mother. The children and grandparents are very attached and close to each other.

The subject children have [four] maternal cousins in the Pittsburgh area. Witness believed [Father's] primary deficiency in parenting was his alcohol consumption and the drinking prevented [Father] from engaging with or watching the children.

Witness also called the police for a "welfare check" on [Father] and the children and to his knowledge the police took no action following said check.

Mother has no relatives on either side of the family in the Kansas City area.

- 14 -

The children enjoy going to school in the Grove City School District. The court appointed David Gloss, Esquire as Guardian Ad Litem ("GAL") for the children. In addition to a report, which is admitted into evidence, the GAL testified in these proceedings. It was the GAL's conclusion relocation was not in the best interest of the children. The GAL further believed the evidence was clear the children had "been prepared by the mother" for the meeting with the GAL and led to believe life in Missouri is "nirvana". As examples the GAL pointed out V.L. desired to move to Missouri to ride a yet to be built roller coaster and C.L.'s mimicking of [Mother's] statements. The GAL further stated that C.L., when pressed, will admit he has had good times at [Father's] house.

The GAL summarized his position by stating the children were born and raised in the area, all friendships and family are in the Grove City area, no family in Kansas City, all grandparents are within close proximity to Mercer County and a belief that an 850 mile move will significantly damage the relationship with [Father]. The GAL's investigation determined both the children and the school district were aware the parent's divorce was "a bad situation" and [Father] and GAL believed that C.L. and [Father] should participate in joint therapy. The GAL saw no enhancement to the children's lives if relocation was granted.

Father believes counseling between he and C.L. is appropriate as well as the parties should undertake co-parenting classes. Father is "extremely happy" when he has his children and does not believe there is any issue with their relationship other than [Mother's] interference. Father indicated he does not receive the [court-ordered] phone calls from the children while they are in [Mother's] custody.

Father believes the relationship with the children has grown over the last year and the relocation would "devastate" the relationship he and his family have with the children. Father also believed it would be "horrible" to move the children away from their family, friends, and dog. Father believes he should have 50/50 custody, and at a minimum, the children should be with him and not the maternal grandparents when mother works.

Trial Court Opinion, 6/14/22, at 1-22.

On December 20, 2022, Mother filed her petition to relocate from Grove City, Pennsylvania to Lee's Summit, Missouri. *See* Mother's Petition to Relocate, 12/20/22, at 1-2. Father opposed the petition and the trial court held a hearing on the matter. On June 14, 2023, the trial court filed its findings of fact, conclusions of law, and order in the case, where it denied Mother's petition to relocate and modified the existing child custody order. Mother filed a timely notice of appeal. *See* Trial Court Opinion and Order, 6/14/23, at 1-45. She raises one claim on appeal:

> Whether the [trial] court erred as a matter of law or abused its discretion in denying [Mother's] petition for relocation due to [] the court finding that the children's relationship with [Father] would deteriorate while ignoring the factors of relocation[] and the best interest of the children would be with [Mother] relocating and [Father] having more time under [Mother's] proposal than the ordered custody[?]

Mother's Brief at 5.

Our scope and standard of review of custody determinations are well-settled.

> Our scope [of review] is of the broadest type and our standard [or review] is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial [court that] presided over the proceedings and[,] thus[,] viewed the witnesses [firsthand]. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of

law, or are unreasonable in light of the sustainable findings of the trial court.

. . .

With any child custody case, this Court has long stated that the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all [] the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child. When a custody dispute involves a request by a party to relocate, we have explained, there is no black[-]letter formula that easily resolves relocation disputes[. R]ather, custody disputes are delicate issues that must be handled on a case-by-case basis.

*C.M.K. v. K.E.M.*, 45 A.3d 417, 421 (Pa. Super. 2012) (quotation marks, citations, and original brackets omitted).

Section 5337(h) of the Pennsylvania Domestic Relations Code, 23 Pa.C.S.A. §§ 5321-5340, sets forth the factors that a trial court must consider, "giving weighted consideration to those factors which affect the safety of the child[,]" in determining whether to grant, or deny, a petition for proposed relocation. 23 Pa.C.S.A. § 5337(h). Those factors are as follows:

(1) The nature, quality, extent of involvement[,] and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings[,] and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child[,] and the likely impact the relocation will have on the child's physical, educational[,] and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h)(1-10). "The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in" Section 5337(h). 23 Pa.C.S.A. § 5337(i)(1). "Each party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S.A. § 5337(i)(2).

When the non-relocating party objects to both the relocation, as well as the proposed modification of custody in a counter-affidavit, the trial court, in addition to considering the ten factors enumerated in Section 5337(h), must also consider the sixteen custody factors set forth in Section 5328(a) before

granting relocation and modifying an existing custody order. ***A.M.S. v.***

***M.R.C.***, 70 A.3d 830, 836 (Pa. Super. 2013). Those factors are as follows:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party[,] and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in [23 Pa.C.S.A. §] 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life[,] and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent[,] and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational[,] and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a)(1-16).

In the case at bar, the trial court carefully considered the ten factors of Section 5337(h) in denying Mother's relocation petition and the sixteen factors of Section 5328(a) in modifying custody. On appeal, Mother takes issue with the trial court's credibility determinations, as well as the weight the trial court placed on certain evidence and certain factors when it denied her relocation petition. *See* Mother's Brief at 13-19. However, this Court cannot disturb a trial court's factual findings or its credibility and weight determinations absent a finding that the trial court abused its discretion. *C.M.K.*, 45 A.3d at 421. Here, a review of the trial court's thorough and careful June 14, 2023 opinion demonstrates that there has been no such abuse. Therefore, after reviewing the briefs of the parties, the relevant law, the certified record, and the opinion of the able trial court judge, the Honorable Ronald D. Amrhein, Jr., we

conclude that Mother is not entitled to relief in this case, for the reasons expressed in Judge Amrhein's June 14, 2023 opinion. Therefore, we affirm on the basis of Judge Amrhein's opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Amrhein's June 14, 2023 opinion.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/21/2023

FILED IN MERCER
COUNTY PA

2023 JUN 14 AM 11: 36

RUTH A. BICE
PROTHONOTARY

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
CIVIL ACTION

ADAM LEYTRICK,                           :
        Plaintiff                     :
                          :

        vs.                          : No. 2022-2278

STEPHANIE LEYTRICK,                      :
        Defendant                     :

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

Currently before this Court is Plaintiff/Father's Motion to Modify Custody requesting joint physical custody as well as Defendant/Mother's Request to Relocate to Lee's Summit, Missouri. The Court presided over hearings on March 31, 2023 and May 31, 2023. The Court also notes the minor children were interviewed on September 21, 2022 regarding a Protection from Abuse ("PFA") action filed by Mother against Father which is related to the instant proceedings.

## FINDINGS OF FACT

Mother, Stephanie Leytrick, currently resides at 507 ½ Stewart Avenue, Grove City, Mercer County, Pennsylvania 16127 with the children C.L., 9 years old, and V.L., 7 years old. Father is forty-four (44) years old and also resides in Grove City, Pennsylvania. Father resides alone, other than when the subject children are with him.

Father has lived in the Grove City area for approximately fourteen (14) years and the children have lived in the Grove City area their entire lives. The parties were married April 24, 2010. There is a dispute, and it is unclear, when the parties separated. Mother alleged both March 2022 as well as September 2022 while father alleged January 2022. All parties agreed since separation the children have resided primarily with mother.

Father was previously employed as a meat cutter at Giant Eagle in New Castle, Pennsylvania. He is currently unemployed but the issue is being grieved through the union process. Mother works for an agency known as "clipboard" and is an RN. She works primarily in long term care facilities in Beaver and Clarion Counties. Mother currently makes $48.00/hour. Mother works approximately twenty (20) hours per week.

Mother's parents live approximately forty-five (45) minutes from her current location as does her brother. She also has four (4) nieces and nephews, ranging in age from four (4) to eleven (11).

Father's family is comprised of sixty-one (61) people from the generation of his parents, himself, and his children. The court notes the subject children are close with their paternal cousins. Mother admitted the children have a good relationship with their maternal grandparents as well as with paternal grandmother.

All witnesses agreed the children are well-behaved, do well in school, and are active. When with father, the children play with other kids in his neighborhood, C.L. plays garage hockey with his father, they go on walks, or hunting, father plants flowers,

2

watches movies and cooks with V.L. and they all go swimming in the pool. V.L. likes to sing and dance. When the children are with mother they go bowling, to the park, play school, play frisbee, play ball, or go to the Olympic Fun Center, a roller skating facility. Discipline in father's house is time out or a smack on the butt and mother testified to relying on timeouts. No evidence was presented as to any physical abuse of the children by any party.

Other than one PFA to be discussed hereinbelow, no evidence was presented as to any physical abuse between the parties and in fact, mother specifically stated father was not physically abusive. Mother admitted father loves the children.

Father testified mother is a great mother and has always had the best interest of the children at heart until her recent decision to relocate to Lee's Summit. At the time of the children's birth, father worked full-time and mother worked part-time. Therefore, mother undertook most of the duties with the children although father cooked and helped with diapers.

Father did know the name of the children's dentist but incorrectly identified the children's pediatrician. When the parties were together mother primarily took the children to the doctors and dentist and tended to them when they were ill. The children tend to come to mother for emotional support. Father did not know the names of the teachers or call the school to find out. He indicated there was no need because the children do well in school. Father acknowledges there is probably an "app" that would

allow him to have information regarding the children's extracurricular school activities but he had not investigated same.

Father indicated he did not attend children's events because he did not have notice or had to work. The court notes father did not utilize the ability for a school "app" to educate himself. Father admits he has not gone to many of the children's medical appointments. Mother has on at least one occasion sent father a video of the child's extracurricular school activity.

C.L. played baseball for two (2) years. Father coached the first year and attended all practices and games the second year. The child did not play a third year because mother would not commit to make sure the child was there and is not playing this year because mother will not commit as a result of her desire to move to Lee's Summit with the children.

The controlling custody order is of November 10, 2022. The order provides the parties share joint legal custody with mother exercising primary physical custody. Father's partial custody is on a "week one" and "week two" basis. Week one father has the children from Sunday at 3:00 p.m. until Tuesday morning until they are put on the school bus or returned to mother at 9:00 a.m. Week two father has the children from Saturday at 9:00 a.m. until the children are placed on the bus or return to mother at 9:00 a.m. on Monday morning.

During Week two father also exercises custody from Thursday after school until Friday morning when the children are placed on the school bus or return to mother at 9:00 a.m. This order provides Thanksgiving visitation with mother from 9:00 a.m. to 4:00 p.m. and father from 4:00 p.m.

In support of father's case, in addition to his testimony, he presented the testimony of his mother, Marsha Leytrick, his sister in law, Susan Leytrick and his aunt, Susan Dellapiazza. Mother presented the testimony of herself, as well as her fiancé, Jason Atkinson, and her father, Paul Sereda. All witnesses which addressed father's drinking agreed father had a moderate to severe drinking problem prior to March 2022. Father likewise agreed. Father drank approximately eight (8) to twelve (12) cans a beer on a daily basis. All evidence indicated father's drinking occurred after work, and while at the home. Father voluntarily went to rehab because mother threatened she would move away and he would never see the children again. Father successfully completed a fourteen (14) day rehab at Banyon Treatment Facility in March 2022. Father's "sober date" is March 21, 2022. Father stated he has an occasional urge to drink, but not very often. When he does, he makes a phone call or attends a meeting.

All of father's witnesses testified since rehab father has not consumed any alcohol in any manner. To maintain his sobriety father reads "the big book", attends meetings, attends speaker meetings, and talks with a woman that has over a decade of sobriety.

Paternal grandmother testified since father's rehab there has been a 100% change, he is 100% active in the children's lives, spends time with the children playing garage hockey, swimming, and other activities. Paternal grandmother indicated no concern for the children's safety in father's custody, no evidence of a relapse, and they talk daily. Paternal grandmother indicated when father was drinking you could tell by his eyes, his more "mellow" attitude, but she did not notice a change in his speech.

Father's sister in law, Susan Leytrick, indicated prior to rehab father's drinking would render him lethargic, slurred speech and his demeanor would be different and essentially more isolated. She sees father on an occasional basis. Since rehab there has been no evidence of drinking or alcohol issues.

Father's aunt, Susan Dellapiazza, indicated she was able to tell when father had been drinking because of his red face, not eating, slurring speech, and isolating. She has seen no evidence since father's rehab of drinking or any evidence of alcohol whatsoever. She has no safety concerns regarding the children being in father's care and no doubt father is no longer drinking.

Mother testified she believes father continues to drink. However, the court does not find this testimony credible. Mother stated as a result of being together for twenty-two (22) years she knows what father sounds like when he is drunk and even in the last week, and multiple other times, she believes he has sounded drunk on phone calls with the children. However, when mother requested the police to perform a welfare check as a

result of her suspicions, the police took no action and did not remove the children from father's care. Additionally, mother testified the minor children told her father indicated he had water in a beer can. However, in addition to said testimony being hearsay, the children did not testify to same. Mother also alleged father continues to drink based on a photograph, which was not admitted into evidence, allegedly containing a beer can within said photograph. Said evidence is insufficient to find father continues to drink, or more importantly, any alcohol usage is a danger to the children.

Of concern to this court is father's decision to unilaterally remove himself from depression/anxiety medications. It is this court's intent to order father to schedule an evaluation, and to comply with any recommendations regarding treatment and medications. During father's rehabilitation a physician ordered medication for depression and anxiety. This medication included one medicine to be taken one time daily, and a second medication to be taken one (1) to four (4) times a day, if needed. Father unilaterally removed himself from the medications in the last month or two without consulting, informing, or involving a physician.

In approximately September 2022 mother requested a PFA order on behalf of herself and the children. Following a hearing on September 21, 2022 this court granted a six (6) month PFA order with regard to mother and denied the order with regard to the children.

Mother alleged in the petition, in relevant part, through the course of an argument "Defendant [father] flung the door open so forcefully, that the door knob hit the Plaintiff [mother] and knocked her down". Mother alleged this caused a bruise on her hip.

The petition also alleged the children are scared of the defendant [father]. During the course of the instant proceedings mother indicated regarding the PFA there was an argument, about custody of the children, and during the course of the argument father pushed through an unlocked door and the door hit her in the hip. Mother alleged the door left a bruise "for weeks". Father testified he did not force the door open but rather placed his foot in the door to prevent mother from closing it and he believed mother fell into the door.

The court notes despite the allegations in the PFA petition the children were afraid of father, the children testified on September 21, 2022 in the course of the PFA hearing. At that time, V.L., was six (6) years old, and indicated father does "grab her by her hands or her arms and that it hurts" when she is not listening. Despite mother's testimony she only uses time out, V.L. through the course of the PFA hearing testified mother smacks her on the butt "sometimes" and that dad "does it all the time". When this court asked whether father ever says anything that makes V.L. afraid of him, she limited her response to an incident in which she believed father forced her to "eat a pill". When the Court followed up asking if father had ever done or said anything that makes her

afraid V.L. indicated no. V. L. specifically testified, "if he[father] didn't make me eat the pill I wouldn't be scared of him".

C.L. testified regarding the "pill" incident indicating father attempted to have V.L. take an adult Advil as opposed to a small Advil. C.L. also testified sometimes father says if the child calls mother he would smack the child which "makes me feel a little bit scared". C.L. indicated father has never actually smacked the child. C.L. indicated mother "sometimes she grabs my arm…" when he is not listening essentially pinching his wrist. C.L. indicated dad was "way more scary because he screams really loud". Although child indicated father makes "threats", child was unable to produce any examples. C.L. testified with regard to the "door" incident. The parents were arguing about father taking children for custody time, mother tried to shut the door and dad "like pushed it and then slammed it into my mom". Father believes his relationship with C.L. was awesome and they were both very active and like outside. Father's relationship with V.L. was very good and they plant flowers, cook and watch movies.

The Court believes both parents have inappropriately talked with the children regarding the potential move to Lee's Summit. The Court finds mother improperly influenced the children to desire to move to Lee's Summit. V.L. testified through the course of the instant proceedings the hearing was about moving to Kansas City and mom told her that. V.L. testified they had been to Kansas City on two (2) occasions. V.L. indicated the trip to Kansas City was like a vacation. V.L. testified she wanted to do

gymnastics in Kansas City but did not know gymnastics were available in Mercer County. The child also stated she did not know what gymnastics were. Mother told V.L. there was gymnastics in Kansas City but did not tell her there was gymnastics in the area.

V.L. also wished to go to Kansas City because there is a roller coaster. When asked whether V.L. preferred to live in Grove City or Kansas City she indicated Kansas City. Her explanation was it was a bigger city. When the Court asked her to compare Kansas City to Pittsburgh, she indicated "Kansas City is way better" and it was because she was going to get new friends. When the Court inquired as to whether V.L. would be okay staying in Grove City "it would have been okay, I mean no". When asked why the child twice simply stated she wanted to move to Kansas City, she indicated it is fun there. When V.L. was asked how often mother talks to the child about Kansas City the child indicated "a little often". The child indicated if mother was not able to go to Kansas City, mother would be "really sad and she'll cry" and she will not be able to talk to her fiancé. V.L. also indicated mother, at least three (3) times, told her she would cry if she could not go to Kansas City. V.L. also indicated father told her they are not moving.

C.L. indicated he was at the hearing because his mother wanted to move to Kansas City and he felt really good about it because he did not like going back and forth between his parent's houses and wanted to stay at one (1) place. C.L. indicated he does not like his father's house because he does not feel safe to go there but indicated father has never hurt him, only hurts his feelings. C.L. indicated he would be okay only seeing

his father once or twice a year. When the Court inquired whether mother told C.L. why she wants to move to Kansas City he indicated because she has a better job there, she met a really nice man there that helps her and it would be a better life for us. In fact, C.L. indicated mother told him that the morning of the hearing.

C.L. also indicated mother told him if the Court does not approve the move to Kansas City "she would be really sad". C.L. alleges he hates going to his father's, gets nauseous at his father's, and sometimes cannot eat. When the court inquired as to why the child had earlier indicated he plays soccer, hockey and baseball at father's house he said "to buy some time". When the court inquired whether mother had even spoken to the child about how often he should see his father, the child indicated "maybe every five (5) weeks". However, the child then denied the conversation. The court notes mother's proposed visitation schedule is every five (5) weeks. C.L. indicated Kansas City was preferable because mom has a better job, there are "way better schools", "way better soccer and football leagues" and "way better friends and stuff". When the Court inquired as to whether mother told C.L. how she would feel if she could not move to Kansas City, he indicated she would cry "because she met a wonderful guy" and "he is the most amazing person". The move would allow "my mom can be happy every single day". He also indicated "my dad never treated my mom nice at all". The Court notes some of the phrases used by C.L. do not seem the natural language of a nine (9) year old child. Of note is mother used the phrase that her fiancé was a "wonderful, caring man". The child

11

also pointed out the two (2) times they left Kansas City "my mom always cries because we have to leave".

The child indicated during the course of the instant proceedings on March 31, 2023 the incident with regard to the PFA "made me feel that I never want to see him again. I never want to care for him. He has hurt my mom so many times, her feelings. Sometimes when he hurts her feelings, he hurts mine." Interestingly, only a few weeks after the incident in September 2022 both children indicated they would have no problem going to father's house again after a two (2) week pause of visitation. C.L. indicated when he moves to Kansas City he will play pickleball but he does not play pickleball here because his mom told them they do not have it here. C.L. indicated his plan is to play sports in Kansas City but if he did not go to Kansas City he would probably not play sports here but he cannot answer why.

Father credibly testified he had great difficulty visiting the children prior to a court order or gaining any amount of time beyond the court order. Father credibly testified "it is always a struggle to get the kids" and when mother works she takes the children to her parents rather than offering the time to father. Father acknowledged in the last approximate month there have been two (2) times mother has agreed to extra time. One was the weekend of the hearing and the other was to allow father to take C.L. hunting. Subsequent testimony established the hunting day was in exchange for father's agreement to bring the children to a church event on Easter day. The children were at an

12

Easter program at the maternal grandparent's church. Father agreed to bring the children for breakfast to the church and allow them to participate in the program, which occurred. Mother and her parents were in attendance. This credible testimony is contrary to mother's testimony father did not allow the children to see her at all this Easter.

Both parties threaten to, or actually, call the police on each other. Father wished the children on Sunday at 9:00 a.m. despite the fact the court order provided he did not receive custody until 3:00 p.m. on Sundays and he threatened to call the police. Mother called the police for a welfare check based on her alleged belief father was under the influence and because father was not allowing the children to talk to her "without supervision".

By agreement of the parties this court issued an order on December 22, 2022 providing the children to be with father from December 22, 2022 after school, or 5:00 p.m., whichever is earlier, until 10:30 a.m. on Sunday. Mother then retained custody until January 2, 2023. Father did not appear at the scheduled exchange on Christmas Day at 10:30 a.m. requiring mother to go to father's home to retrieve the children. Father's explanations were inconsistent and lacked credibility. It was clear to the court father determined to simply disregard the court order.

Father's mother, Marsha Leytrick credibly testified she usually sees the subject children weekly, sometimes babysits the children and visits with the children at her home. She lives approximately an hour and half away from father's residence. Her

observation of the children and father's interaction indicate "a lot of love" and she sees no signs of friction or fear. The witness testified, and it is clear to the Court, the parties do not get along well at all.

Father presented the testimony of his aunt, Susan Dellapiazza. The witness testified she is close with father, they see each other approximately twice a month, mostly at maternal grandmother's house in Bridgeville. The witness lives close to maternal grandmother. She believes father is an outstanding and good father, he is very active, they fish, play garage hockey, cook and walk the dog. The witness described the father and children as close. The witness believed the father and children were a "very close unit".

Mother testified with regard to her desire to move to Lee's Summit, Missouri, a suburb of Kansas City. Although mother's testimony couched the move for the benefit of the children, it is clear the sole basis for the move is her engagement to Jason Atkinson ("fiancé") . The relationship of mother and fiancé began in March 2022 online and they first met in person in Missouri on March 24, 2022.

Initially the parties visited once a month and now visit every two (2) to three (3) weeks. On her first visit to Missouri she fell in love with the city. Mother testified the children did not meet fiancé until the end of 2022. This is contrary to testimony the children met the fiancé in August of 2022.

Mother made the decision at the end of 2022 or the beginning of 2023 to move to Lee's Summit. Lee's Summit is an approximate twelve (12) hour drive or two (2) and one-half (1/2) hour flight from the parties' current residences.

The houses mother proposes to rent in Lee's Summit are of a suburban nature with yards. The homes currently identified by mother are approximately one (1) block from fiancé, will be rented, and each has four (4) bedrooms. It is mother's plan to wed fiancé in October 2023, which she plans to do regardless of whether this court approves the relocation.

Upon the marriage it is mother's belief her fiancé and his four (4) children will move in to the home she is renting. The mother initially testified the children did not meet her fiancé until the end of 2022 although subsequent testimony established the first trip with the children to Kansas City was in August 2022 and that Christmas 2022 was the second trip. Mother indicated the four (4) bedroom home can be rented for approximately $1,200.00 per month and her current rent for an apartment is $750.00 per month. Mother indicated if the court denies relocation she is unsure whether she will move to Kansas City but the marriage will still occur.

Mother testified in an incredible fashion she did not believe the move the Kansas City would affect the children's relationship with father in any way because of technology. Mother did acknowledge father would be unable to attend extracurricular or sporting activities, but alleged father had never done so before. However, this court notes

15

father coached C.L. in baseball one year and in his second year attended all practices and games. When questioned whether mother's proposed partial visitation with father if the move is approved would affect her bond with children if the schedule was flipped, mother was unsure.

Mother attempted to couch her desire to move to Kansas City with her fiancé as for the benefit of the children as it would show the children stability, emotional stability, and they would see a lifelong stable partnership between mother and her fiancé. Mother testified she believes it important for the children to see her with a dependable and supportive partner. Mother believes it's very important for the children to see "love between a couple".

Mother testified education is very important and the kids are doing very well at Grove City. Mother further testified the school district in Kansas City is rated "A+" and that Grove City Schools are "B+". Mother was unable to provide any details other than an internet search to support the ratings. Mother acknowledged the class sizes appeared to be the same and there was no meaningful difference between the school districts. All parties agreed the children do well in school.

Mother currently makes $48.00/hour working for a company called "clipboard". She indicated this company is present in her proposed relocation and she would make $90.00/hour. Mother works per diem approximately twenty (20) hours per week. Mother did not check whether there is higher pay available in any other cities other than Kansas

City. Mother did not research any other school districts or schools in other cities, but rather chose the Lee's Summit Schools because that's where her fiancé's children attend.

Mother admitted she only researched the Lee's Summit School District after she decided to relocate. Mother is an RN. In Kansas City she should be able to obtain her BSN and work towards her goal of being a flight nurse at Ottawa University. Mother credibly testified this opportunity was not as easily available in her current location as the Ottawa program would be approximately fifteen (15) minutes from her home and any such programs in Pennsylvania would be at least one (1) hours from her home.

Mother testified in Kansas City, her fiancé, and her fiancé's two (2) sisters would be available for childcare. Mother also testified childcare would not be necessary as fiancé makes significantly more money and therefore, she could work less. Mother believed her RN license would easily transfer and her Pennsylvania license is sufficient to allow her to work in Missouri.

Mother asserted the childcare availability is particularly important with regard to the move as father is not dependable and does not provide childcare and in fact at the last minute will cancel his commitments. The court notes the availability of maternal grandmother to babysit as well as daycares in the Grove City area. The court also notes the children have a strong bond with the maternal grandmother and they see her every couple weekends.

17

Mother's fiancé is heavily involved in the church and they plan on having counseling for couples with blended families following the move. Mother proposes the court authorize the relocation to Kansas City area and grant her primary physical custody subject to father's partial custody rights. Mother proposes father's custody rights be comprised of two (2) weeks in the beginning and end of summer as well as during the remainder of the year, mother will return for a long weekend every five (5) weeks. Mother also proposes a week of partial custody with father at Easter and a week at Christmas time. Mother indicated she will pay all airfare for her and the children to return, she will then stay in the area visiting her family and friends, and then return with the children at the conclusion of each partial custody of father.

Mother presented the testimony of her fiancé, Jason Atkinson. The witness lives in Lee's Summit, Missouri with his four (4) children, ages fourteen (14), eleven (11), eight (8) and six (6). He has never committed a crime, been subject of a restraining order, been a party to a Children & Youth Services investigation, nor is he subject to any physical disability or illness that prevents caring for children including mental illnesses or disabilities. Witness is Director of Business Development for a financial advisor and works 8:30 a.m. to 4:30 p.m., Monday through Friday.

Fiancé confirms the parties began talking on Twitter before visiting in person which they have done at least a dozen times. Mother and fiancé have visited both in Kansas City and in Pennsylvania and speak two (2) to three (3) hours a day, at least, on

the phone. During the subject children's visit at Christmas 2022 they went to the park, played video games together, and played baseball. The parties also went to a golf driving range known as Top Golf, went to a nephew's wedding and "had a really fun time". Fiancé and C.L. played "a little bit" of pickleball in Kansas City. It is clear to the court fiancé has a very strong affection for both children.

Fiancé characterized the relationship between the children and mother as very good. He indicated she is "the most fantastic mother I've ever met". Fiancé described the neighborhood as houses of approximately 1,500 square feet, single family homes, and in the $200,000 range.

Fiancé is unable to relocate here due to the nature of his job especially in comparison to mother's ability to easily relocate as an RN. Fiancé added "obviously, I have 4 kids of my own, as well".

Mother also presented the testimony of her father, Paul Sereda. The witness lives in Greenville, Pennsylvania which is approximately thirty-five (35) minutes from the parties current location.

The witness owns a tavern. He sees the subject children usually a couple times a week and at least, every other weekend. They go to the park which is right next door to his residence, play ball, ride on the side by side, or go through the woods, go to fairs, horseback riding, and around farms. He also teaches C.L. about gun safety. Since the parties' separation witness has not observed father around the children. Witness sees the

19

children a lot more in the summer. Witness has taught V.L. how to play guitar and maternal grandmother has taught the children some piano.

Both the maternal grandparents spend a lot of time with the children and have a very close bond. Witness described the mother's relationship with the children as very caring and "a mother bear" and believe she is a wonderful mother. The children and grandparents are very attached and close to each other.

The subject children have four (4) maternal cousins in the Pittsburgh area. Witness believed father's primary deficiency in parenting was his alcohol consumption and the drinking prevented father from engaging with or watching the children.

Witness also called the police for a "welfare check" on father and the children and to his knowledge the police took no action following said check.

Mother has no relatives on either side of the family in the Kansas City area.

The children enjoy going to school in the Grove City School District. The court appointed David Gloss, Esquire as Guardian Ad Litem ("GAL") for the children. In addition to a report, which is admitted into evidence, the GAL testified in these proceedings. It was the GAL's conclusion relocation was not in the best interest of the children. The GAL further believed the evidence was clear the children had "been prepared by the mother" for the meeting with the GAL and led to believe life in Missouri is "nirvana". As examples the GAL pointed out V.L. desired to move to Missouri to ride

20

a yet to be built roller coaster and C.L.'s mimicking of mother's statements. The GAL further stated that C.L., when pressed, will admit he has had good times at father's house.

The GAL summarized his position by stating the children were born and raised in the area, all friendships and family are in the Grove City area, no family in Kansas City, all grandparents are within close proximity to Mercer County and a belief that an 850 mile move will significantly damage the relationship with father. The GAL's investigation determined both the children and the school district were aware the parent's divorce was "a bad situation" and the father and GAL believed that C.L. and father should participate in joint therapy. The GAL saw no enhancement to the children's lives if relocation was granted.

Father believes counseling between he and C.L. is appropriate as well as the parties should undertake co-parenting classes. Father is "extremely happy" when he has his children and does not believe there is any issue with their relationship other than mother's interference. Father indicated he does not receive the court ordered phone calls from the children while they are in mother's custody.

Father believes the relationship with the children has grown over the last year and the relocation would "devastate" the relationship he and his family have with the children. Father also believed it would be "horrible" to move the children away from their family, friends, and dog. Father believes he should have 50/50 custody, and at a minimum, the children should be with him and not the maternal grandparents when

21

mother works. Should mother choose to move to Kansas City, and the children remain in Mercer County, father proposes the same visitation schedule as proposed by mother except father believes mother should have eight (8) weeks in the summer.

## ANALYSIS OF RELOCATION FACTORS

The Court believes a decision on relocation is necessary before a custody decision may be made. Therefore, the Court will review relocation factors first.

1. **The nature, quality, extent of involvement and duration of the children's relationship with the party proposing to relocate and with the non-relocating party, siblings, and other significant persons in the children's life.**

This factor strongly favors father. The evidence is clear father's relationship with the children was significantly impaired prior to his rehab, there is no such credible evidence following his rehab stay. Further, the children have no relations whatsoever in Kansas City. Within an hour and a half (1 ½) hours of their current location the children have three (3) grandparents, multiple cousins, aunts, uncles and other relatives. There are no half siblings as neither parent has children from any other relationship. The current nature of the relationship between V.L. and father appears appropriate. The court notes C.L.'s testimony regarding his desire to essentially terminate any meaningful relationship with his father. However, C.L. attributes this desire to an incident occurring in September 2022. The court interviewed the child immediately after the incident and C.L. did not

22

indicate his desire to terminate the relationship with his father. It is further apparent to this court mother has had extensive discussions with the children and improperly influenced them.

2. **The age, developmental stage, needs of the children and the likely impact the relocation would have on the children's physical, educational, and emotional development, taking into consideration any special needs of the children.**

This factor strongly favors father. There is no evidence of any special needs of the children. C.L. is nine (9) years old and V.L. is seven (7) years old. All parties agree they are well-behaved children and do very well in school. Mother testified her internet research indicated the Missouri School is an A+ and the local schools are B+ but admitted essentially there is no meaningful difference. The Court believes there would be no impact, positive or negative, on the children's physical or educational development. However, there will be a negative impact on emotional development as there will be in an area with no relatives whatsoever and separated from all grandparents, aunts, uncles and importantly, father.

3. **The feasibility of preserving the relationship between the non-relocating party and the children through suitable custodial arrangements, considering the logistics and financial circumstances of the parties.**

This factor favors father. Should Mother relocate Kansas City, her proposed custody schedule is father having one (1) long weekend every five (5) weeks, a week at

23

Thanksgiving and Christmas, and two (2) two (2) week periods in the summer. However, this proposal does not account for the children's contact with any of their grandparents, their aunts, uncles or cousins. Further, father credibly testified, without any rebuttal, he does not receive any of the court ordered phone calls when the children are in mother's custody. Additionally, C.L.'s testimony regarding his attitude towards father indicates more frequent contact, and more importantly counseling, is necessary. Should C.L. only see his father one (1) weekend every five (5) weeks and not have the benefit of counseling, it is extremely likely their relationship will deteriorate beyond repair. The court further notes C.L.'s opinion, allegedly based on the September 2022 "PFA" incident is markedly more drastic than at the time of the actual incident.

4. **The children's preference, taking into consideration the age and maturity of the children.**

This factor is neutral. V.L. age seven (7) does not fully appreciate the impact of the move. Further, she wanted to move because it would be "fun". V.L. indicated she wished to move to Kansas City to do gymnastics, was unaware gymnastics were available in Mercer County, and indicated she did not really know what gymnastics was. Both children admitted to more than one (1) discussion with mother regarding the move, various statements made by mother, C.L. used language that does not seem age appropriate, and neither child indicated anything which would occur in Missouri that was not available in Mercer County other than mother's fiancé.

24

**5. <u>Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the children and the other party.</u>**

This factor slightly favors father. Father credibly testified prior to the court order it was difficult for him to have visitation with the children. Father further credibly testified since the order mother has only accommodated additional custody on two (2) occasions. One (1) in exchange for an Easter church service. Father credibly testified he does not receive any of the court ordered phone calls when the children are in mother's custody. Conversely, father clearly intentionally and willfully violated this court's order of December 22, 2022 in failing to return the children on Christmas Day.

**6. <u>Whether the relocation would enhance the general quality of life for the party seeking relocation, including but not limited to financial, or emotional benefit or educational opportunity.</u>**

This factor favors mother. Emotionally she will be able to reside with, and marry, her fiancé. Educationally she will be able to reside within close proximity of a higher learning center which will facilitate her receiving her BSN degree and advancement in her chosen career as a nurse. Financially mother testified to an almost double pay rate should she move while at the same time indicating she will not be working as many hours due to her fiancé's financial situation. Further, mother failed to investigate closer options such as Pittsburgh, Cleveland or Youngstown.

7. **Whether the relocation enhances the general quality of life for the children including but not limited to financial, emotional benefit or educational opportunity.**

This factor favors father. No testimony was presented establishing mother was unable to increase her hours of twenty (20) per week to benefit the children financially or she was unable to find a job from any other agency or working directly for a hospital or other provider. Mother's testimony was limited solely to her current employer. Educationally mother admitted the current schools and the Missouri schools are comparable. All parties agree the children do well in school. Emotionally all parties agree the children are well adjusted and behave well. All parties testified to the strong relationship the children have with the parents of both parties as well as cousins, aunts, and uncles of both parties. Further, C.L. will benefit from the opportunity to enter counseling with father.

8. **The reasons or motivations for each party for seeking or opposing relocation.**

This factor is neutral. The court believes mother in good faith has requested relocation and believes relocation is in the best interest of the children. Father opposes relocation due to the effect it will have on his relationship with the children and the effect it will have on the children themselves as well as the relationship between the children and all of their relatives.

9. **The present and past abuse committed by a party or a member of the party's household and whether there is a continued risk of harm to the children or an abused party.**

This factor slightly favors mother. Mother admitted other than an incident in September 2022 the father has never been physical aggressive with her. Mother also admitted the father has never been physically aggressive with the children. The children's testimony revealed no physical aggression by either party. Father testified she is a great mother other than her desire to relocate to Lee's Summit, Missouri. This factor slightly favors mother as this court did grant the PFA order in favor of mother against father. However, the court notes the PFA was for six (6) months as opposed to a longer period of time and the injuries to mother were caused by father aggressively passing through an unlocked door. This court granted a PFA by finding father recklessly caused bodily injury as opposed to intentionally or knowingly.

## CUSTODY FACTORS

1. **Which party is more likely to encourage and permit frequent and continuing contact between the children and the other party.**

This factor slightly favors father. The credible testimony establishes father does not receive his court ordered phone calls during mother's custody. The credible testimony establishes when mother works, the children are taken to her parents, rather than to father. Mother, other than the weekend before the May 31, 2023 hearing and one (1)

27

other occasion, in exchange for father's concession on Easter, has not agreed to any additional time. Father failed to follow this court's order on December 22, 2022 and interfered with mother's ability to regain custody of the children on Christmas Day. However, mother's proposed partial custody upon relocation is one (1) long weekend every five (5) weeks, one (1) week at Christmas and Thanksgiving, as well as two (2) two (2) week periods in the summer. Father's proposed scheduled should he have primary physical custody included eight (8) weeks in the summer with mother. Father also repeatedly indicated holiday time would be "negotiable" and they could work it out. The court finds no evidence of any risk to the children moving forward.

2. **The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the children.**

The Court incorporates the discussion of Relocation Factor No. 9. Further, the court believes each party is capable of adequate physical safeguards and supervision of the children. There was no testimony presented either party had difficulty providing for childcare or the children's wellbeing.

3. **The parental duties performed by each party on behalf of the children.**

This factor strongly favors mother. The court notes father was unable to identify the children's pediatrician. The father was unable to identify the teachers of the children.

The father, other than C.L.'s baseball, had little to no involvement in extracurricular activities. Although father indicated he was not informed of same, he admitted he could have discovered the information for himself through the school. Mother was primarily responsible for doctor's appointments, dentist appointments and the like.

4. **The need for stability and continuity in the children's education, family, life and community life.**

This factor strongly favors father. The children have resided in Grove City, Mercer County their entire life. Within approximately one (1) and a half (1/2) hours are four (4) cousins on the children's maternal side, sixty-one (61) relatives on the paternal side, including multiple cousins and both maternal grandparents and paternal grandmother. There was no testimony regarding the children's friends or neighborhood while in mother's custody. While in father's custody the credible testimony indicated the children play with friends in the neighborhood. The children do well in school and have been in Grove City schools their entire educational life. Although the children testified they wished to play pickleball, ride roller coasters, and testimony regarding singing and dancing lessons was offered, the court finds all of these opportunities are available in Mercer County.

5. **The availability of extended family.**

This factor strongly favors father. The discussion immediately above is incorporated herein.

6. **The children's sibling relationships.**

This factor is neutral. Neither party proposes separating the children for custody purposes. Neither party has children from any prior or subsequent relationships.

7. **The well-reasoned preference of the child, based on the child's maturity and judgment.**

The Court incorporates the discussion of Relocation Factor No. 4.

8. **The attempts of a parent to turn the children against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the children from harm.**

This factor favors father. The Court notes no reasonable safety measure is necessary to protect the children from harm. No evidence was presented that either parent is abusive to the children. However the circumstantial evidence strongly suggests mother has attempted to turn the children against father. Immediately following mother's request for PFA order in September of 2022, this Court interviewed both children. V.L. indicated except for an instance in which father tried to make her take a pill, later determined to be an Advil through testimony of C.L., she was not afraid of father at all. C.L. testified he was not afraid of father and he would have no objections returning to father after a two (2) week pause in custody. However, six (6) months later C.L. testified regarding the same incident in a much more drastic fashion essentially indicating he had no interest in having a relationship with his father and he has hated his father since the incident. Both

30

children also testified as to how great Kansas City would be and various opportunities that existed there, and in their opinion, no where else. Both children admitted mother spoke with them on more than one occasion regarding moving to Kansas City and on the morning of their testimony. Both children testified as to how sad mother would be if the move did not occur, how she would cry. C.L. indicated fiancé is "a wonderful man", parroting statements made by mother.

9. **Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.**

This factor slightly favors mother. The evidence was clear prior to March 2022 father, although loving his children, was not able to maintain a stable, consistent or nurturing relationship due to his alcoholism. Mother was mainly responsible for all needs of the children. The unequivocal testimony is father consumed eight (8) to twelve (12) cans of beer per day while at home. Further, since separation, father has not had an extensive opportunity to care for the children as mother did not agree to partial custody prior to an order, and the nature of the order is set forth above. There is no evidence the children are not properly cared for by either party following father' rehab. This Court acknowledges C.L.'s statements with regard to his emotions and feelings toward father. The Court incorporates the discussion regarding the children's well-reasoned preference and attempts to turn the child against the father.

10. <u>Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.</u>

This factor is neutral. The Court incorporates custody factors Nos. 8, 9 and 10.

11. <u>The proximity of the residences of the parties.</u>

Currently this factor is neutral. The parties live in the same school district and relatively close to each other. However, should mother move to Lee's Summit, Missouri, approximately eight hundred and fifty (850) miles away, this factor would strongly favor father.

12. <u>Each party's availability to care for the children or ability to make appropriate childcare arrangements.</u>

This factor is neutral. Mother has indicated she works part-time and is available to care for the children. When she is working her parents are available. Father's testimony established his family members, in addition to himself, are available to watch the children.

13. <u>The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.</u>

The court incorporates relocation factors discussing this issue. Further, the court finds this factor neutral or slightly favoring father. There is high conflict between the

32

parties. The parties have on more than one occasion threatened to call the police on each other. It is apparent each party has violated court orders on at least one occasion. There is no evidence of abuse by any party towards the children. Mother's failure to allow phone calls, and very limited visitation schedule for father should she move to Missouri in the summer and very minimal agreement to partial custody in addition to the court order is all slightly favorable to father. However, the court notes father's blatant disregard of a court order with regard to Christmas visitation in 2022.

14. **The history of drug or alcohol abuse of a party or member of a party's household.**

This factor favors mother. Prior to March 2022 the evidence is clear father had a significant alcohol problem that even his family described as moderate to severe. The unequivocal testimony establishes father consumed eight (8) to twelve (12) beers per day. However, since rehab, father asserts his sobriety which is supported by his family's testimony. Mother's testimony is based on her belief of his intoxication over the phone, a belief not supported following a welfare check by law enforcement. Mother also discussed, although did not offer, a photograph containing one (1) can of beer that father indicated was one (1) of his beers of choice. This factor further favors mother as father was prescribed depression/anxiety medications in his rehabilitation stay in March 2022 and has removed himself without consulting with a physician.

33

15. **The mental and physical condition of a party or member of a party's household.**

This factor is neutral as there is no evidence of any mental or physical condition of any party interfering with custody.

16. **Criminal convictions of a party or member of a party's household.**

This factor is neutral. There is no evidence of such.

## DISCUSSION

The Court incorporates herein the analysis of the factors with regard to relocation and custody set forth above as well as the findings of fact.

With regard to relocation, the court believes the overwhelming evidence requires the court deny same. In essence, mother has elected Lee's Summit, Missouri for the sole and exclusive reason her now fiancé resides there. Interestingly, when her fiancé was asked about moving to Mercer County he referenced having four (4) children as an impediment to the move. The Court does not question the bond between the fiancé and the children, or the relationship between mother and fiancé. However, this does not overcome the best interest of the children.

The children have lived their entire lives in the Grove City, Pennsylvania area. The children do well in school. All of the children's grandparents live within approximately one and a half (1 ½) hours of Grove City, as do most of their cousins, aunts, and uncles. The children have friends, at least in father's neighborhood.

34

Mother's testimony regarding the benefits to the children can all be summed up as they will be better off being exposed to fiancé and his love for mother. The extracurricular activities the children assert they wish to perform in Kansas City are available in the general Grove City area. Interestingly C.L., appears to only wish to undertake extracurricular activities in Kansas City, but not in Grove City. Schools are comparable. Children would lose all regular contact with their family, and most importantly their father.

Although father clearly had a significant alcohol problem prior to March of 2022, the evidence does not support an ongoing problem. Father's past active alcoholism does not support removing the children eight hundred and fifty (850) miles. Also father credibly testified mother had previously threatened she would move the children away and he would never see them again.

Mother clearly attempt to, and successfully did, influence the children's testimony. Both children testified as to mother speaking with them regarding the positive benefits of Kansas City the morning of their testimony before this court. V.L. indicated mother spoke to her "a little often" about the move. Both children indicated if they did not move mother would be very sad and would cry all the time. C.L. testified seeing mother cry upon leaving Kansas City at Christmas 2022.

Mother filed a PFA in September 2022 alleging the children were afraid of father. C.L. did not testify to same, and V.L. testified other than her belief father attempted to

have her taken an adult Advil instead of a children's Advil, she was not afraid. September 2022 both children agreed after a two (2) week pause of visitation with father, they would have no concerns or issues with returning to the custody. However, six (6) months later, C.L. indicates that ever since the "PFA incident" he has essentially hated his father and wants nothing to do with him. The farther away in time from the incident, the worse C.L. perceives it and the more dramatic his view of the incident is. The only logical conclusion is this is fueled by mother. The court believes the evidence clearly establishes the best interest of the children are to remain in the Grove City area with their friends, school and relatives that they are comfortable and thriving with, as opposed to moving to Kansas City where they will only know fiancé and his four (4) children.

The court further notes mother testified father refused to allow receipt of the children in anyway on Easter of 2023 despite the credible testimony an arrangement was made for the children to appear at the maternal grandparents' church, have breakfast there, and participate in a play.

As to custody modification, the evidence establishes a significant increase in custody at this time with father is not appropriate. Regardless of the reasons, C.L. now expresses serious concerns. Further, the testimony established father, prior to March of 2022, has never been very active or engaged in the children's lives. Father returned home from work, went outside, and consumed an approximate twelve (12) pack of beer on an almost daily basis. In the course of the hearing, father did not know teacher's names or

36

the pediatrician's name. Father has not attended many, if any, of V.L.'s events. Father indicated mother had not told him of same, but acknowledged he did not explore the school's app which would have given him that information.

Additionally, father clearly and intentionally violated this court's order with regard to Christmas 2022 visitation.

Conversely, mother does not ensure the children participate in court ordered phone calls with father when they are in her custody. Mother was not cooperative with father in arranging significant partial custody prior to the court's custody order of November 2022. Following said order, mother has only agreed on two (2) occasions to agree to any additional time. One of these occasions was the result of a "trade" to allow the children to participate in the grandparents' church play. Despite the children's most recent testimony regarding their desire to not visit father, both children testified as to many activities they undertake with father, and the time they enjoy there.

Hence this Order,

FILED IN MERCER
COUNTY

2023 JUN 14 AM 11: 36

RUTH A. BICE
PROTHONOTARY

IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA
CIVIL ACTION

ADAM LEYTRICK,
        Plaintiff

        vs.             : No. 2022-2278

STEPHANIE LEYTRICK,
        Defendant

## ORDER

AND NOW, this _14_ day of June, 2023, IT IS HEREBY ORDERED Mother's request for relocation to Lee's Summit, Missouri is DENIED.

IT IS FURTHER ORDERD custody of the children is modified as outlined below:

1. The parties shall have joint legal custody of children, C.L. and V.L. Each party shall have full and complete access to all scholastic, medical, dental, psychotherapy, social service, extracurricular and other similar records and reports concerning the children and the providers of same are hereby authorized and directed to communicate directly with and furnish copies of any reports, pertaining to the children, as authorized by law, to either party upon request. Each party shall be entitled to reasonable, advanced notice of special events in which the children participates including school activities, healthcare appointments, extracurricular, religious activities and similar events so that both parents will have an opportunity to share the experience with the children. The

38

custodial parent will notify the non-custodial parent of any medical emergency of the children at the earliest possible moment.

2. Mother shall have primary physical custody of the children subject to Father's partial physical custody rights as follows:

    a. For the school year defined as commencing seven (7) days prior to the first day of school and ending three (3) days after the last day of school:

        i. For "week one" father shall have the children from Sunday at 3:00 p.m. until Tuesday morning at either 9:00 a.m. when he returns the children to mother or when the children are placed on the school bus;

        ii. For "week two" father shall have the children from Saturday at 9:00 a.m. until Monday morning at 9:00 a.m. when he returns the children to mother or when the children are placed on the school bus.

        iii. For "week two" father shall have custody of the children from Thursday after school, or 4:00 p.m., until Friday morning at 9:00 a.m. when he returns the children to mother or when the children are placed on the bus.

        iv. Should father's visitation include a Monday holiday in which the children do not have school, other than Easter, Thanksgiving or

39

Christmas, the children shall remain with father until 5:00 p.m. as opposed to the 9:00 a.m. return time.

v. As the parties are currently engaging in a week one/week two visitation schedule, the rotation as currently exists shall remain in place with regard to which weeks are one and/or two.

b. The children will always be with Mother on Mother's day and with Father on Father's day. Said days are defined as 9:00 a.m. to 9:00 p.m.

c. With regard to Christmas:

i. On even numbered years, mother shall have the children from Noon on Christmas Eve until 1:00 p.m. on Christmas Day and father shall have the children from 1:00 p.m. on Christmas Day until 1:00 p.m. on December 27.

ii. On odd numbered years, father shall have the children from Noon on Christmas Eve until 1:00 p.m. on Christmas Day and mother shall have the children from 1:00 p.m. Christmas Day until 1:00 p.m. on December 27.

d. With regard to Easter and Thanksgiving:

i. Mother shall always have the children from 8:00 a.m. until 3:00 p.m. and father shall always have the children from 3:00 p.m. until 9:00 p.m.

The above holiday schedule supersedes the normal custody schedule.

    e.  In the months of June, July and August, father shall have one seven (7) day consecutive period of visitation each month which shall include his previously scheduled visitation in said week.

    f.  For years other than 2023, father shall inform mother in writing no later than April 1 of each year of the weeks in which he intends to exercise.

    g.  For calendar year 2023, the parties shall agree as to father's visitation weeks.

    h.  Should mother work more than five (5) consecutive hours, she shall offer father the opportunity to exercise partial custody during said work time. Mother shall offer said time immediately upon receipt of her work schedule. Should father elect to exercise his visitation, and then be unable to do so, it is his responsibility to ensure the children are properly cared for either by a relative, competent adult, or daycare provider, at his cost. All communication with regard to this shall occur through AppClose.

3. The non-custodial party shall be entitled to one (1) ten (10) minute phone call per day when the children are in the other party's custody. It is the custodial parent's obligation to ensure the call is initiated and the children remain engaged in same.

41

4. The parties shall cooperate with each other to accommodate special requests concerning physical custody of the children to ensure the children have the fullest opportunity to enjoy the extended family of both parties.

5. The parties shall cooperate with each other to accommodate the children's participation in scholastic and extracurricular activities. The children shall not be enrolled in any such activity without consent of both parties, or order of court.

6. All custody exchanges shall occur at the Sheetz gas station located in Grove City, Pennsylvania, Pine Township.

7. Neither party will permit the children to be transported in any uninsured vehicle nor in a vehicle operated by an individual who is unlicensed or has consumed an intoxicant.

8. The children will be always be properly restrained with lap and shoulder harness, appropriate seat belt, and if required by law, an approved child safety seat.

9. Neither party shall deprecate, disparage or demean the other party, or say or do anything in the presence of the children, or allow any third party to do so, that would tend to cause the children to hold the other party in a bad light.

10. The parties will have communication in a respectful manner. Each party shall, at all times, provide the other party with a working telephone number in the case of emergency. All communication, except in an emergency, shall be through the Appclose

application and limited to custody matters. Both parties shall download and initiate that app within forty-eight (48) hours of today's date.

11. Neither party shall discuss any matters of custody or support in the presence or hearing of the children, or allow a third party to do so. Each party shall hold the other party up as someone to be loved, respected and obeyed.

12. Within ten (10) days of this Order, father shall schedule an evaluation with a psychiatrist or psychologist. Father shall fully disclose his relevant history including the fact that he was prescribed depression/anxiety medication in March 2022 and he removed himself from the medication without doctor's orders. Father shall take all medication as prescribed and attend all follow up appointments as recommended by the psychologist/psychiatrist.

13. C.L. and father shall enroll in counseling together. If counsel for both parties are unable to agree on the identity of a provider within thirty (30) days, the GAL shall designate said provider with deference to insurance issues.

14. This Court shall exercise continuing exclusive jurisdiction of the children in all matters of custody involving the children.

15. All prior orders of this court are hereby VACATED and this shall be the sole custody order between the parties unless superseded or modified by order of court.

16. The parties are free to mutually agree, in writing, to modifications of any portion of this order, whether on a one time, temporary, or more permanent basis.

## 17. RELOCATON

Each party shall maintain his or her current residence, and in the event either party shall intend to change his or her residence, the party proposing to relocate shall give the other party sixty (60) days advance written notice by certified US mail, return receipt requested, and by regular US mail, of his or her intent to relocate and provide the following:

    a.  The address of the intended new residence.

    b.  The mailing address, if not the same as the address of the intended new residence.

    c.  Names and ages of the individuals in the new residence, including individuals who intend to live in the new residence.

    d.  The home telephone number of the intended new residence, if available.

    e.  The name of the new school district and school.

    f.  The date of the proposed relocation.

    g.  The reasons for the proposed relocation.

    h.  A proposal for a revised custody schedule.

    i.  Any other information which the party proposing the relocation deems appropriate.

j. A counter-affidavit as provided under 23 Pa.C.S. §5335(d)(1) which can be used by the non-relocating party to object to the proposed relocation and the modification of a custody Order.

k. A warning to the non-relocating party that if the non-relocating party does not file with this Court an objection to the proposed relocation within thirty (30) days after receipt of the notice, that party shall be foreclosed from objecting to the relocation.

BY THE COURT,

_____ J.
Ronald D. Amrhein, Jr., Judge

ald

CC Atty Primiano
Atty Gross
Atty Parson

45